Okay. First matter is U.S. v. Forde. Mr. Campbell. Good morning, Your Honor. It's Matt Campbell, Federal Public Defender for the District of the Virgin Islands, on behalf of Daquan Forde. I'd like to reserve five minutes for rebuttal. Okay. And I would ask for permission to be seated because that's the angle that my camera is at.  Thank you, Your Honor. I wouldn't have known had you not told me. I didn't know if you were standing or sitting anyhow. I believe in candor to the court. You've probably noticed, at least now from experience, we are all sitting. We are. That's true. Another astute observation by our judge. Thank you, Your Honor. Because the Fourth Amendment issue in this case is brought for preservation purposes only in light of United States v. Baxter, I'll be focusing today on the Fifth Amendment issue exclusively in argument. Okay. And in regard to that issue, the district court erred in denying Mr. Forde's motion to suppress his statements made both while in baggage handling and in secondary inspection. Well, why the baggage handling? I don't understand. You've got an issue with the secondary inspection. But the baggage handling is open carousel. How in the world is that suppressible? I assume Your Honor is asking how could that be considered in custody? Right. Well, it's part of the border search. It's the normal inquiry into the admissibility into the territory. They want to know whose bag it is. Understood, Your Honor. But under the unique circumstances of this case, we're arguing that effectively this was not a border search exception case, as that term was discussed in the Cayenne and St. Valier cases. Let me ask you, is that what you're arguing or are you arguing that he was in de facto custody because there were four armed officers that were with him and he was and they admitted as much as he was not free to leave as soon as they approached him? Well, Judge, I think effectively we have to argue both because if he's not in custody, then there's no Miranda requirement. So we are arguing that he was in custody because of the nature of the stop, the fact that there were four officers present, that they were all in uniform, that they were wearing firearms, that he was approached at an airport, which is a highly regulated state, that he was approached in a manner. While it was in baggage claim, the officers placed themselves between him and the exit. So he wasn't free to leave. Presumably he couldn't go back the way that he came. So it's your position they should have Mirandized him at that point? Correct, Your Honor. And that's because in this case has several important differences from the Cayenne and St. Valier cases. In those cases, there was legitimate issue as to whether or not a person and or their effects would be admitted here. The facts were uncontradicted that the luggage was searched before Mr. Ford was ever approached. They located what appeared to them to be marijuana. The decision was made that whoever picked up that bag would be prosecuted. They called HSI agents and summoned them to the airport. So unlike in, say, Cayenne, where they suspected that Mr. Cayenne might be guilty of alien smuggling, but they asked additional questions to determine whether he would be admitted and whether his guests would be admitted. Officers in this case knew that Mr. Ford was going to be prosecuted. That decision had already been made. They knew that his luggage was not going to be admitted. They had already made that decision. So in this in this unique situation. All those decisions have been made. Criminal proceedings had, in effect, already been instituted. So this is the exception, frankly, that's discussed in both Cayenne and and St. If you're right about that, what about the good faith exception? Why wouldn't that apply? The good faith exception apply. The district relied upon that in part. Has it been applied in the Fifth Amendment context? The district court relied on the good. I'm trying to answer both questions at once. The district court did talk about good faith in regard to Baxter. However, in the Fifth Amendment context, either he had those rights or he didn't. So the good faith meant the district court applied good faith in regard to Baxter. Now, we argued that that was erroneous, but I'm not going there for purposes of today's argument. But in the Fifth Amendment context, if he was required to have his Miranda rights read to him, then the error occurred in good faith, frankly, doesn't apply. And that's that's essentially where we believe we are. Well, excuse me. My my my question is, and perhaps I've just missed something very fundamental. But is there a good faith exception to Miranda as there is in the Fourth Amendment context? We have two separate motions to suppress here, correct? Correct. Yeah. So I mean, right. And at least from my understanding, it would be helpful to be separating inquiry into two, to both of those and for your arguments to go separately to both of those. So since we're focusing right now on the statements made, is there a recognized good faith exception to Miranda as it should be applied in this case? Your Honor, I believe the answer to that question is no. And in part, that stems from the nature of Leon in those cases that provided for the Fourth Amendment. In the Fourth Amendment context, a good faith exception. The notion behind Leon was that if an officer went to a neutral magistrate and asked the neutral magistrate for permission to conduct a search and the officer reasonably relied on the neutral magistrate's determination, that was the basis for the Leon decision. In this context, we don't really have that. We have officers deciding that they have the right to question somebody without a waiver. So I would also argue that the nature of the Miranda is different than the Fourth Amendment context where the good faith applies, because nobody is saying that they couldn't question Mr. Ford. They're simply saying if they were going to question Mr. Ford after determining that he was going to be prosecuted and after calling in law enforcement agents, then they had to read him his rights. So when specifically, in the context of this case, when specifically should they have Mirandized him? They approach him at the baggage claim. When should they have Mirandized him? Immediately upon approaching him and making contact, Your Honor. So as soon as he identifies himself as Ford, they should have Mirandized him? It would be our position that at the outset of the conversation, they would need to Mirandize him. So before even asking him if he is Ford? I think strictly speaking, the answer to that question is yes. I would admit that I might have trouble making out prejudice if they asked him his name first. But as soon as they asked him his name, they could tell you the name to the bag, right? And that's an incriminating statement. Arguably correct, although Officer Anderson's testimony was that whoever picked up the bag was going to be arrested. So the name was really irrelevant then. From the testimony and the district court's findings, it appears that the name was largely irrelevant. Going back to the question, when should they have Mirandized him? As soon as they approach him. That's what your argument is. So they say, hello, these are your Miranda warnings. That's how this would play out? Your Honor, again, I think I would have a difficult time making out prejudice if they said, we're Customs and Border Patrol, are you Mr. Ford? Yes. You have the right to remain silent. I mean, I think I might have trouble making out prejudice. But, yes, essentially at the outset of the conversation, they would need to Mirandize him. But that's because that's what Kayyam and St. Beliar say. They say that a line needs to be drawn, and that line should be drawn at the point at which the decision has been made to institute criminal proceedings. And that decision was made before they ever approached Mr. Ford. Having made that decision, all they had to do was read him his rights. Our position is rather straightforward in that regard. And it is also our position that the reason why the government and the district court in this case generally came to an incorrect conclusion is because they engaged in the analysis that this court in Kayyam said was improper, namely focusing on the nature of the questions asked and whether those were somehow routine questions. Kayyam specifically says that's a line that the court is not willing to draw, that that's a line that's subject to abuse. But in reading the district court's decision, that's largely what the district court focused on when it discussed Kayyam, was the nature of the questions and whether, in fact, they were routine or not. Respectfully, that's not the analysis. And St. Valir specifically mentions that the reason why the questions there were permissible was because at the time of questioning, neither contraband nor an admission of criminal conduct had been obtained. Here we have a case where contraband had already been obtained. This is precisely the type of situation discussed in that case that would have led to the opposite result. For that reason, we believe that we're entitled to a grant to a reversal with instructions to grant a motion to suppress. I'd hit my five minutes remaining. I'll stop now. Mr. Stieper, you respond. Good morning, Your Honor. Adam Sleeper for the United States. This court can affirm without reaching the issue. It's the government's view that by finding the statements voluntary, by determining that he was not. Which team is voluntary? That's weed is the voluntary statement. We're not there yet. Is there any other voluntary statement? Yes, Your Honor. Just to sort of lay out the framework here, it's the government's position that he doesn't necessarily even it's not necessarily even implicated in this appeal because the decision can be rendered based on the fact that he was in what was more equivalent to a Terry stop at the time he was in the airport. So how does it stop when Anderson said whoever came to get that luggage, we're going to arrest? That's not a Terry stop anymore. That's not a limited detention for purposes of making a very limited inquiry. That's basically saying you're going to arrest whoever gets that bag. That's not Terry. Well, Your Honor, I think that there's two steps to whether someone is in custody under Miranda. One is whether they're seized. The other is whether there's this type of coercive pressures accompanying station house questioning. Let me ask you about the seizure. Let me ask you about the seizure. Mr. Officer Anderson is asked. So it's fair to say, in your opinion, at least he was not free to leave the baggage area once you intercepted him. He says exactly. And at that point, you asked him for identification. Yes, he was surrounded by several law enforcement officers that had weapons. He wasn't going anywhere, was he? They were going to let him go. Your Honor, we don't contest seizure here. I would push back on that characterization of the facts a bit. There were four officers around, but only two officers near him. All right. So you would do you do agree he was seized, though. That's the issue. He was seized. He was not free to leave. Well, seizure is, you know, whether he believed he was free to leave or not. We certainly agree that he was not free to leave. And we're not contesting here that even though he was not free to leave, he should have believed he was. So we're not we're not contesting seizure here. We're contesting that second part, whether he was subject to the type of coercive pressures that are linked to station house questioning. And it's the government's view that those types of pressures just aren't present here. He was in. So in your in your in your matrix, Miranda only applies once you get to the station house. No, it's once you're no, Your Honor, it's once you're subject to those types of pressures and those types of coercive. That makes no sense. Under that theory, you could be arrested, taken into a room. Let's say it's not a typical interrogation room, which is gray and barren. But it's a very, very nice. Let's say they take him to the airport lounge. They take him to the American Express lounge in the airport. And they say, you're under arrest. By the way, would you like a pizza or a cup of coffee? Would you like anything? Can we get something out for you? So that it's a very, very relaxed atmosphere. But he's not free to leave. I'm not sure what you're saying with. You're saying that if he's confronted with circumstances sufficient to overcome his voluntary will to resist questioning, that that's because of his custody. But I don't know of any case that says that. If he's in custody, he's in custody. Whether or not they offer him coffee and a sandwich. If he's not free to leave, he's in custody. If he knows he's not free to leave. Well, Your Honor, the types of cases that address that issue and talk about the two preconditions for custody are the types of cases that address Terry stops. And what they talk about is how, yes, you have a Terry stop. You're not free to leave. But it's also the traffic stop sort of situation. It's is this a context where the where you have those types of pressures? And our position is that while this may not, strictly speaking, be a Terry stop, this looks very much like a Terry stop. And I don't know how me on what part of the secretary's top, other than he's standing up and he's not seated in a detention room when they say we're going to arrest whoever picks up the bag. He's surrounded by four officers, two of whom are armed. How is that a Terry stop when the officers say they made the decision to arrest this guy? Once he is associated with that bag, he's toast. How is that a Terry stop? Well, Your Honor, we look to the coercive pressures on on the defendant. The defendant wasn't aware that they were going to arrest him. The defendant had no idea that marijuana had been found in his bag at that time. You know, I guess what I would say is if two police officers just came up and asked him the same questions, you know, because they thought for whatever reason he might have some links to drug trafficking. I think this court would call that a Terry stop. And so when we have a situation that looks like they already decided they're going to arrest him when they asked him the question, I don't have anyone in the right mind who would turn their backs to these officers and start walking away. I don't want anyone to do that. It defies logic to say in that situation. He's going to say officers, I appreciate your interest in my luggage. I commend you for the way you're discharging your obligations, but I'm out of here and turn around and leave. That's just not going to happen. I don't disagree with that, Your Honor. I think that's why we're not characterizing this as a voluntary encounter. We haven't made that argument anywhere in our brief. We've argued instead that it's more akin to a limited seizure. What's limited about it? What's so limited about it? They knew there was marijuana in the bag. There's record testimony they were going to arrest whoever picked up the bag. There are four officers there, two that are armed near him. What's so limited about this encounter? And he's marched from there to secondary inspection. How is this not an arrest? Your Honor, I think that once he was taken to secondary inspection, once they— But he's not under arrest while he's marching from the luggage carousel to the secondary? No, Your Honor, I might concede the marching to the secondary— Okay, so he's under arrest from the hello moment. They're not there to welcome him into the VI. Your Honor, but they did nothing objectively to turn this into an arrest. You know, as I would relate back to what I said before, that if two police officers had come up and asked these very same questions because they suspected the defendant to be involved in drug trafficking and they had a basis for doing that, this court— I couldn't see this court saying that was not a permissible Terry stop, that they had crossed the line from a Terry stop into some sort of functional arrest. But that's one of the government's arguments. But even if the court doesn't agree with that argument, moving past that into the Kiem argument, the test here is whether the questioning objectively seems to have a bearing on the grounds for admissibility and only furthers a potential criminal prosecution. The facts of this case show that there was more to be done. This defendant had more bags. The officers, when searching his additional bags, in fact, found more marijuana. They found inadmissible effects. Their questioning was linked to determining the ownership of these effects, of the effects they were going to be searching. Their search of these—these questions were very linked to just the search of the bags and determining that contraband was not being brought in by the defendant in his effects. This is—in Kiem and St. Valier, they did discuss the potential for the discovery of drugs to be the transition point at which questioning must cease. But the questioning that they were talking about was not the sort of very limited questioning here linked to the baggage. It was a very limited questioning. Within the universe of their interest, it spanned the entire universe. I mean, they didn't ask them about who they thought was going to beat whoever was playing on Sunday. They asked them about the lungers. That's what they were focused in on. So you can say it was limited, but it was not really limited. It was aimed at prosecution. Well, Your Honor, I push back on that a bit. I think that the—or the government submits that the type of questioning that's mentioned in Kiem and St. Valier includes questioning like, what are your intentions for these drugs? You know, who else is involved? Well, I've got to tell you, that is one stupid question. What are your intentions with these drugs? Well, I thought I'd see if I could get a patent and maybe formulate some kind of common running against the cold. I mean, they asked what they needed to ask to put a criminal case together. But, Your Honor, the inquiry under Kiem and St. Valier is not whether there's an overlap. It's not whether this questioning is relevant to a criminal offense. It's whether it objectively doesn't have anything to do with admissibility anymore. And at the point these questions were asked, the luggage search was not complete. And they were asking questions about all of the bags. So you're saying the questions were designed to determine his admissibility? Not his admissibility, Your Honor, because he is a United States citizen. The bag's admissibility. Correct, Your Honor. So they're going to just let the bag come in. They know there's marijuana in there. They're just going to let the bag come on in. Well, no, Your Honor. So one bag was searched. And when that bag was then put on the trail, he picked up that bag. And when he picked up that bag, he had two additional bags. Now, there's some discussion in our briefs over whether one of those other bags was checked or whether none of them were checked. But there's no indication, at least, that the non-checked bag had been subject to screening. And in fact, when they did their later screening of that bag, they found marijuana in it. They were not done examining his effects. They were not done determining whether his luggage as a whole was admissible. Yes, they found controlled substances in one of his bags. But no, they were not done with their admissibility inquiry. So you're tethering admissibility to the admissibility of the bags, not the individual, if I understand you right? Well, yes, Your Honor. I think we have to because they're citizens. They're dependent on the U.S. citizen. Right. The questions had nothing to do whatsoever with his admissibility. And in fact, there's record testimony they were going to arrest whoever picked up. That person was not coming in. Whoever picked up that bag was going to get stopped. Yes, Your Honor. I do want to push back on this testimony regarding the subjective intent of the officers. Though I do acknowledge that, you know, in the context, if he wasn't a U.S. citizen, and this is a context of what's going to happen to someone who wasn't a U.S. citizen, that could be viewed as an admissibility determination. But the admissibility of the person is not an issue in this case because he's a U.S. citizen. We're looking at the admissibility of his effects, that is, the items in his three bags. Unless the court has any questions about involuntariness, the government would be prepared to just ask the court to affirm the decision of the district court. Thank you, Mr. Sieper. Mr. Campbell, you're five minutes, I believe.  I'll try again. Thank you, Your Honor. I want to touch on two points that the government had discussed. The first was its discussion about a Terry stop. We believe strongly that Terry does not apply here. The government, as I understood it, just conceded that at the time that Mr. Ford was met in baggage claim, he was seized. So the question then becomes, what's the legal effect of that seizure? The purpose of Terry stops are to either confirm or dispel suspicion by law enforcement. And that goes back to the Terry case itself. Law enforcement here was not confirming or dispelling anything. It had already made its decision that the person who picked up the bags was going to be arrested. So this simply is not a Terry stop encounter. The government has conceded it's a seizure. As the court had discussed, he wasn't free to leave. The government was not dispelling anything. There were no answers that Mr. Ford could have given at that point that wouldn't have ended up with him being arrested. So having conceded that it is a seizure, it is unquestionably an arrest. So we believe that the Terry analysis simply does not apply here. I want to touch on the government's discussion of Kayyem and the fact that the government claims that there was more to be done. Yes, Mr. Ford had a grand total of three bags. But again, law enforcement had already determined that he was going to be arrested and that at least one of those bags was going to be admissible. To the extent that the government still had inquiries into the other two bags, without prejudice to our Baxter arguments, the government had the option of simply searching those bags. And in fact, that's exactly what the government did here. It went through the bags piece by piece. In one of the bags, it discovered a small amount of marijuana. In the other bag, it discovered nothing of interest. So to the extent that the government wants to tether this analysis to, despite the fact that the government had already determined that Mr. Ford was to be arrested and that his primary luggage was not admissible, nevertheless, the government gets to keep asking questions about other bags. We would argue that that isn't correct, that since they could do whatever they wanted with those bags in terms of searching them, assuming the Baxter analysis doesn't apply, they had ample opportunity to make admissibility determinations without asking Mr. Ford anything. And since it was obvious that any answers that he gave would subject him to further guilt about the criminal prosecution that they had already effectively instituted. So while perhaps subject to Baxter, they could search as much as they wanted. That doesn't mean that they should not have Mirandized him prior to asking him any questions further. Those are the two points that I wanted to respond to. I don't think at this point I have anything further to add. Good. Thank you both for your arguments and we'll take a matter and do it by.